# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No.: 12-cv-20922-UU

AF HOLDINGS, LLC,

      Plaintiff,

v.

DOE'S 1-31,

      Defendants.

_____/

## ORDER SEVERING THE CLAIMS AGAINST DOES 2-31 WITHOUT PREJUDICE AND VACATING THE PORTIONS OF THE COURT'S ORDER GRANTING DISCOVERY AS TO DOES 2-31

THIS CAUSE is before the Court upon a *sua sponte* review of the record.

THIS COURT has considered Plaintiff's Complaint, the pertinent portions of the record, is otherwise fully advised on the premises.

## I.  BACKGROUND

AF Holdings, LLC, ("Plaintiff"), is a limited liability company organized and existing under the laws of the Federation of Saint Kitts and Nevis. [D.E. 1 ¶2]. Plaintiff claims to own the copyright to the adult-entertainment video entitled "Sexual Obsession" ("Video").  *Id*. ¶¶ 3, 24.  Additionally, Plaintiff purports to have applied for and received a certificate of copyright registration[1] from the United

_____

[1] "Reg. No. PA0001725120".  [D.E. 1  ¶25].  This Court notes that as of the date and time of this Order, the U.S. Copyright Office's public Copyright Catalog entry for the motion picture "Sexual

1

States Copyright Office for this Video.  [D.E. 1 ¶ 25].

On March 6, 2012, Plaintiff filed its Complaint, alleging that thirty-one unknown Defendants ("Does") utilized the file-sharing protocol BitTorrent to infringe upon Plaintiff's exclusive rights with respect to the Video.   [D.E. 1 ¶¶ 2, 4]. Plaintiff asserts that in the course of using proprietary forensic software to monitor Internet-based infringement of its copyrighted content, Plaintiff's agents observed the unlawful reproduction and distribution of the Video via the BitTorrent-protocol occurring among a group of Internet-protocol ("IP") addresses.  *Id.* at ¶ 4.  These addresses are alleged to have been part of a BitTorrent "swarm"[2] particular to Plaintiff's video, and upon this observation, Plaintiff created a log listing the IP addresses along with the date and time of alleged infringing activity.  *Id.* at ¶ 27-29. Plaintiff has submitted this log as Exhibit A.  [D.E. 1-1].  As of the Complaint's

---

Obsession"—matching Plaintiff's listed registration number of PA0001725120–does not list Plaintiff AF Holdings LLC as either the copyright claimant or the entity assigned authorship.  Instead, copyright registration number PA0001725120 lists "Heartbreaker Films " as the copyright claimant and author of "Sexual Obsession."  Plaintiff has filed an additional lawsuit against a single Doe defendant in this same Court (as well as against additional Doe defendants in our sister courts) alleging infringement of the same copyrighted work.  *AF Holdings LLC. v. John Doe.*,Case No. 12-cv-22156-UU, Compl. [D.E. 1].  Plaintiff's filings in 12-cv-22156 contain a copy of the aforementioned copyright registration record—attached as Exhibit A to that case.  *Id*. [D.E. 1-2]. In that case, Plaintiff filed a Copyright Assignment Agreement. *Id*. [D.E. 1-3].  If Plaintiff believes that this agreement applies to the instant case, Plaintiff must amend to include these documents as exhibits to the Complaint in order to establish that Plaintiff has proper standing and is the real party in interest in the instant case as required by Fed. R. Civ. P. 17(a).

[2] BitTorrent is a peer-to-peer ("P2P") file sharing system enabling users, through the use of a BitTorrent client, a computer program capable of downloading and uploading data utilizing the BitTorrent-protocol, to distribute data over the Internet.  In BitTorrent terminology, a "swarm" consists of multiple "peers" sharing a "torrent."  A "torrent" can mean either a .torrent metadata file or **all** filles described by it, depending on context.  Glossary of BitTorrent Terms, http://en.wikipedia.org/wiki/Glossary_of_BitTorrent_terms (Last visited August 3, 2012).  Metadata can be described as "data about data", or "information about information".  Nat'l Info. Standards Org., *Understanding Metadata*, NISO Press (2004), http://www.niso.org/publications/press/UnderstandingMetadata.pdf.

filing, the actual names of the Defendant Does associated with the IP addresses listed in Exhibit A were unknown.  [D.E. 1 ¶¶ 1, 4, and 20].  Plaintiff expects to obtain the names of all Does through the means of discovery.  *Id.* ¶ 1.

The day after filing its Complaint, Plaintiff requested leave to issue subpoenas pursuant to Fed. R. Civ. P. 45 prior to the Fed. R. Civ. P. 26(f) conference. [D.E. 4].  In particular, Plaintiff sought to discover the "name, current (and permanent) address, telephone number, e-mail address, and Media Access Control address" of the Doe Defendants, and indicated that it planned to obtain this information by issuing subpoenas to the six Internet Service Providers ("ISP"s) who provided Internet service to each of the Doe Defendants.  *Id.*

On March 12, 2012, U.S. Magistrate Judge Edwin G. Torres granted Plaintiff's motion. [D.E. 6].  On March 16, 2012, Plaintiff filed a notice of deposition, indicating that it intended to depose the ISPs and obtain the production of documents. [D.E. 7].  Plaintiff attached six subpoenas to its notice [D.E. 71-1] which were subsequently issued by the United States District Court for the Northern District of Illinois and served by hand-delivery and certified mail.

On April 19, 2012, "Doe 2" filed a motion in this Court to quash the subpoena issued by the District Court for the Northern District of Illinois that had been served upon Verizon, his ISP.  [D.E. 9].  In this motion, "Doe 2" claimed to be a resident of Tampa.  *Id.*  In addition, two individuals, one allegedly from the Tampa area [D.E. 12], and the other allegedly from Orlando [D.E. 19], filed similar motions to quash the subpoenas. [D.E. 12, 19].  All three motions were denied because this

Court does not have statutory authority to quash or modify a subpoena issued from another district.  [D.E. 14, 24, 25].

On July 2, 2012, this Court issued an order to show cause asking the Plaintiff to show cause why venue is proper in the Southern District in light of the fact that the individuals who moved to quash allegedly reside outside of this district. [D.E. 26].  On July 9, 2012, Plaintiff filed a response to the July 2, 2012 order to show cause. [D.E. 27].  In the response, Plaintiff did not show cause by supplying any facts supporting venue in this district.  Oddly, Plaintiff merely argued that the logical inverse of the Court's receipt of motions to quash solely from residents outside of the Southern District is that residents within the district have not filed such motions due to the unavailability of defenses and the resulting low probability of success. *Id*.  Plaintiff further resisted discussing venue absent "a proper motion to dismiss for improper venue." *Id*.  This response was insufficient, as noted in this Court's subsequent order.  [D.E. 28].

On July 12, 2012, this Court issued an order to show cause, again asking Plaintiff to show cause as to why venue is proper in the Southern District of Florida. *Id*.  Additionally and relatedly, this Court asked why it should rely upon Plaintiff's use of geolocation technology ("geolocation") to establish proper jurisdiction and venue. *Id*.  This Court had reviewed technical literature on the subject and learned that geolocation can utilize one or more of a number of methods, and that some of these are more accurate than others. *Id*.  Given that Plaintiff had not provided any details as to the methodology it had employed in its

4

usage of geolocation, instead merely asserting that geolocation had been used,[3] and Plaintiff's earlier evasive response to the Court's order requiring a showing that venue is proper in this district, this Court was appropriately concerned with whether Plaintiff was making appropriate use of the federal court in, at least this instance, and possibly others.

On July 20, 2012, Plaintiff filed a response to the July 12, 2012 order to show cause.  [D.E. 31].  Plaintiff's answers again were non-responsive.  Plaintiff conceded that geolocation is imperfect, but challenged this Court not to reject the technology (presumably as a whole) as it would result in Internet lawlessness with respect to copyrights.  *Id.*  As to this court's questions regarding the Plaintiff's use of geolocation, Plaintiff answered that it "used a commercial geolocation database to automatically associate each IP address with a geographic location."  *Id.* at 2.  Plaintiff provided no further detail about this database, such as its name, publisher or creator, accuracy or reliability, how recently it was updated, or why this Court should rely upon it aside from stating that it "provides a list of known proxy servers."  *Id.*  Plaintiff further claimed that its "...agents culled the IP address list..." and "...attempted to eliminate [...] 'coffee shop[s with] open wi-fi' [networks], proxy servers and other non-consumer IP addresses from the IP address list."  *Id.*  But there was no explanation as to how this was accomplished despite this Court's order specifically requiring a "showing of the precise methodology and technique

---

[3] No specific documentation, such as the database's geographic location results for the IP addresses listed in Exhibit A [D.E. 1-1] was provided to this Court.

5

employed by the Plaintiff in its use of geolocation to establish—to a reasonable degree of certainty—that the Defendant may be found within this district" and "that due diligence, as well as due care, [has] been employed in ascertaining that the IP addresses associated with the alleged tortfeasors are or were assigned to a system or node that can be used to reasonably calculate the identity of the alleged infringing party." [D.E. 28 at 6].

Plaintiff also categorically stated that this Court "may reasonably follow the jurisprudence of a decade's worth of federal court decisions that have relied on Internet Protocol addresses to identify Internet-based infringers." [D.E. 31 at 1]. The question presented in the Court's order, however, did not concern the usage of geolocation in general, nor whether IP addresses have been relied upon in the past by other courts. Rather, this Court's inquiry was specific to Plaintiff's usage of geolocation in the instant case. Plaintiff's resistance to directly answer this Court's questions is unacceptable.[4] Geolocation aside, however, this Court now turns its

---

[4] This Court is concerned with Plaintiff's failure to comply fully with its request to explain the geolocation technology employed in this case for at least two significant reasons. First, in Plaintiff's response to the July 12, 2012 order to show cause [D.E. 28], Plaintiff stated, "For the record, Plaintiff's agents used a commercial geolocation database to automatically associate each IP address with a geographic location." [D.E. 31]. This Court used a similar method to test the reliability of such databases for purposes of establishing proper jurisdiction and venue. The results placed four IP addresses within this District, with an additional two possibly corresponding to locations within this District. The majority of IP addresses, however, corresponded with locations in Tampa, Orlando, and Jacksonville with a small number being listed as geographically corresponding to Lake City, Ocoee, Leesburg, Altamonte Springs, and Naples. These are clearly outside of the Southern District of Florida's jurisdiction. Alternatively, a second database placed several IP addresses in the states of New York, New Jersey, Virginia, and Georgia. This Court has already noted the potential unreliability of such databases. See [D.E. 28] ("... databases of IP location mappings fall victim to being rough and incomplete... due to the Internet's rapid expansion.")

Additionally, Plaintiff's Exhibit A [D.E. 1-1] lists among the Internet Service Providers "Bright House Networks" and "MPInet", but neither Bright House Networks nor MPInet (including its owner Smart City Telecommunications) provide internet service to residents of this District. See

attention to whether the Defendants in this case have been properly joined.

## II.  LEGAL STANDARD

Fed. R. Civ. P. 20(a)(2) describes the requirements for the permissive joinder of defendants.  It provides that persons "...may be joined in one action as defendants if: (a) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (b) any question of law or fact common to all defendants will arise in the action."

The purpose of Fed. R. Civ. P. 20 is to promote trial convenience and expedite the resolution of disputes, subsequently eliminating unnecessary lawsuits. *Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1323 (11th Cir. 2000) *overruled on other grounds by Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003).  "Under the Rules, the impulse is toward entertaining the broadest possible scope of action consistent

---

Zip Code Form, http://brighthouse.com/central-florida/localize (Last visited July 31, 2012). (Listing the following Florida counties within its drop-down menu of service areas: Brevard, Citrus, Flagle, Hernando, Hillsborough, Lake, Manatee, Marion, Orange, Osceola, Pinellas, Pasco, Polk, Sumter, and the Florida Panhandle Area.); MPINET - A Smart City Company, http://www.mpinet.com/about_us.asp (Last visited July 31, 2012). (advertising that despite seven years of growth while providing technology solutions to the Central Florida Business community since 1996, they remain dedicated to providing Central Florida residents with the best possible internet solution at a fair price.); Orlando's Business Internet Provider, http://www.mpinet.com/contact_us.asp (Last visited July 31, 2012).  *See also* Smart City Telecom, http://www.smartcitytelecom.com (Last visited July 31, 2012).  ("Smart City is the local telephone company serving the communities of Celebration, Lake Buena Vista and Little Lake Bryan, Fla. Whether you live, work or play in these communities, Smart City is your one stop destination for all of your voice and Internet services."); Contact Us, http://www.smartcitytelecom.com/my-smart-city/contact (Last visited July 31, 2012). (listing the contact information for both residential and business voice and data services serving  Celebration and Lake Buena Vista, Fl.  Additionally listing the contact information for services provided to "Rest of Central Florida".)

with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged." *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 724 (1966).

"The Federal Rules, however, also recognize countervailing considerations to judicial economy." *Alexander,* 207 F.3d 1303, at 1323.  Fed. R. Civ. P. 42(b), for example, allows for a court to order separate trials in the interests of "convenience, to avoid prejudice, or to expedite and economize..."[5]  Additionally, Fed. R. Civ. P. 20(b) permits a court to order separate trials "to protect a party against embarrassment, delay, expense, or other prejudice that arises from including a person against whom the party asserts no claim and who asserts no claim against the party."[6]

In practice, the rules regarding both joinder and misjoinder should be "construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding."  Fed. R. Civ. P. 1.  Such decisions by

---

[5] Fed. R. Civ. P. 42(b) evidences an intent by the drafters of the Federal Rules of Civil Procedure to provide the courts with broad discretion in the structuring of litigation and framing of issues.  While Fed. R. Civ. P. 42(b) and Fed. R. Civ. P. 21 serve similar purposes, they are distinguishable as each results in a distinct outcome.  The former, when applied, results in separate trials of claims which were originally sued upon together and typically results in the ultimate entry of a single judgment.  The latter severs defendants and/or claims which then become independent actions to be tried and adjudged independently.  *See Gaffney v. Riverboat Services of Indiana, Inc.*, 451 F.3d 424, 441–442 (7th Cir. 2006) (explaining that severance under Fed. R. Civ. P. 21 creates two discrete, independent actions, which proceed as separate suits for the purpose of finality and appealability, while application of Fed. R. Civ. P. 42(b) results in bifurcation, appropriate in cases where final resolution of one claim affects the resolution of the other and the claims are factually interlinked, but separate trials may be appropriate.)

[6] Similar to Fed. R. Civ. P. 42(b) (*See supra* at n. 5), Fed. R. Civ. P. 20(b) evidences the intent that the district courts are to be afforded discretion in the structuring of litigation.  "The general philosophy of the joinder provisions of the federal rules is to allow virtually unlimited joinder at the pleading stage but to give the district court discretion to shape the trial to the necessities of the particular case."  § 1660 Separate Trials under Rule 20(b), 7 Fed. Prac. & Proc. Civ. § 1660 (3d ed.). that any such causes of action can not be conveniently disposed of together, the court may order separate trials.")

the district courts hinge upon the particular facts and circumstances of each case. *See Alexander*, 207 F.3d 1303, at 1324-25 ("... the decision to order separate trials naturally depends on the peculiar facts and circumstances of each case.") In making a determination whether to exercise its discretion to sever under Fed. R. Civ. P. 20, the court should examine whether such trials would minimize the likelihood of undue delay and prejudice. *Id.* at 1325. District courts have broad discretion in choosing whether to join parties or not, and as long as the decision falls within the court's range of choices it will not be disturbed. *Swan v. Ray*, 293 F.3d 1252, 1253 (11th Cir. 2002).

While misjoinder of parties does not permit the dismissal of an action, "[o]n motion or on its own, the court may at any time, on just terms, add or drop a party. The court may also sever any claim against a party." Fed. R. Civ. P. 21. "The scope of application of Rule 21 is extremely broad and covers any civil action in the federal courts." § 1682 Application of Rule 21—In General, 7 Fed. Prac. & Proc. Civ. § 1682 (3d ed.). Fed. R. Civ. P. 21 is often invoked to correct improper joinder of parties under Fed. R. Civ. P. 20. *DirecTV, Inc. v. Leto*, 467 F.3d 842, 844 (3d Cir. 2006) (noting that Fed. R. Civ. P. 20(a) permits joinder and Fed. R. Civ. P. 21 governs misjoinder.); *C.L. Ritter Lumber Co., Inc. v. Consolidation Coal Co.*, 283 F.3d 226, 229 (4th Cir. 2002) (interpreting Fed. R. Civ. P. 21 to permit a court to cure party misjoinder "at any stage of the action."); *DIRECTV, Inc. v. Collins*, 244 F.R.D. 408, 411 (S.D. Ohio 2007) (finding misjoinder under Fed. R. Civ. P. 20,

applying Fed. R. Civ. P. 21 to sever all but the first defendant from the case, and directing the plaintiff to pay a civil filing fee and file a civil cover sheet for each of the newly created cases.)

Furthermore, the district courts have broad discretion when applying Rule 21. *United States v. O'Neil*, 709 F.2d 361, 367 (5th Cir. 1983).; *See also Rice v. Sunrise Express, Inc.*, 209 F.3d 1008, 1016 (7th Cir. 2000) (noting that it is within the district courts' broad discretion in deciding whether to sever a claim.); *Benson v. RMJ Sec. Corp.*, 683 F. Supp. 359, 378 (S.D.N.Y. 1988) (exercising the District Court's "wide discretion" in applying Fed. R. Civ. P. 21 to drop a defendant from an action.)  Dispensible nondiverse parties may even be dropped through the application of Fed. R. Civ. P. 21 after judgment has been rendered.  *Newman-Green, Inc. v. Alfonzo-Larrain,* 490 U.S. 826, 832 (1989). *Accord Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567, 572 (2004).

Notwithstanding the discretion afforded to federal courts in applying Fed. R. Civ. P. 20-21, a clear impediment to dropping a party defendant, or multiple party defendants from an action under Fed. R. Civ. P. 21 exists when the defendant is a necessary and indispensable party to the litigation. *United States v. Washington Inst. of Tech.*, 47 F. Supp. 384, 385 (D. Del. 1942) *aff'd*, 138 F.2d 25 (3d Cir. 1943). Whether a party is necessary and indispensable can only be determined in the context of a particular litigation.  *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 118 (1968).

## III. JOINDER

The recent flood of reverse mass-tort lawsuits involving the alleged misuse of BitTorrent to infringe upon various plaintiffs' copyrights has led numerous federal district courts to address whether joinder in such lawsuits is appropriate. While joining large numbers of parties in a single lawsuit is attractive to plaintiffs by lowering the cost of litigation, it also presents significant problems of fairness and justice to the defendants, each of whom may be subject to substantially different circumstances and as a result may raise wildly diverging defenses. The courts have grappled with this issue, with differing results. A number of courts have found permissive joinder proper.[7] Others, however, have found misjoinder and have severed all but one defendant.[8] This Court now examines Plaintiff's joinder of thirty-one Doe defendants in the instant case.

### A. Required Joinder of Parties Under Fed. R. Civ. P. 19

Here, the Court sees no need to join the Doe defendants in a single lawsuit. See *Temple v. Synthes Corp., Ltd.*, 498 U.S. 5, 7, 111 S.Ct. 315, 316 (1990) ("It has long been the rule that it is not necessary for all joint tortfeasors to be named as

---

[7] *See, e.g., K–Beech, Inc. v. Does 1–57*, 2011 WL 5597303 (Report and Recommendation), *adopted by*, 2011 WL 5597293 (M.D.Fla.2011); *Nu Image, Inc. v. Does 1–3,932*, 2012 WL 1890854 (Report and Recommendation), *adopted by*, 2012 WL 1890829 (M.D.Fla.2012); *Digital Sin, Inc. v. Does 1-176*, 279 F.R.D. 239 (S.D.N.Y. 2012); *Call of the Wild Movie, LLC v. Does 1-1,062*, 770 F. Supp. 2d 332 (D.D.C. 2011); *Voltage Pictures, LLC v. Does 1-5,000*, 818 F. Supp. 2d 28 (D.D.C. 2011); *First Time Videos, LLC v. Does 1-76*, 276 F.R.D. 254 (N.D. Ill. 2011).

[8] *See, e.g., Bubble Gum Productions, LLC v. Does 1-80*, 12-20367-CLV-SEITZ, 2012 WL 2953309 (S.D. Fla. 2012); *Liberty Media Holdings v. BitTorrent Swarm*, 277 F.R.D. 669 (S.D.Fla., 2011); *In re BitTorrent Adult Film Copyright Infringement Cases*, 2012 WL 1570765 (E.D.N.Y. May 1, 2012) (Order and Report and Recommendation); *DigiProtect USA Corp. v. Does 1–240*, 2011 WL 4444666 (S.D.N.Y. Sept.26, 2011); *Cinetel Films v. Does 1–1,052*, 2012 WL 1142272 (D.Md. Apr.4, 2012); *Hard Drive Prods., Inc. v. Does 1–888*, 809 F.Supp.2d 1150 (N.D.Cal.2011).

defendants in a single lawsuit.") *Accord Laker Airways, Inc. v. British Airways,*
*PLC*, 182 F.3d 843, 847 (11th Cir. 1999).  None is a required party as per Fed. R.
Civ. P. 19(a)(1)(A) or (a)(1)(B).

The only theory supporting necessary joinder is Plaintiff's claim that one
individual can be associated with several IP addresses and therefore multiple Doe
Defendants may be the same individual.  [D.E. 1 ¶ 11].  As Plaintiff claims, joinder
is proper because "...a single individual can be associated with multiple IP
addresses.  Due to the dynamic nature of consumer IP address assignments, an
individual's IP address can change frequently.  Thus Plaintiff's monitoring
software, which identifies infringing activity by IP address, may identify multiple
instances of infringing activity that are actually associated with a single
individual..." *Id.*  But, this Court is not persuaded that a single individual is likely
to be associated with the IP addresses listed on the log attached to Plaintiff's
Complaint. [D.E. 1-1].  First, three individuals, providing distinct identifying
information, have moved to quash the subpoenas issued in the present case. [D.E. 9,
12, 19].  Second, in addition to listing 31 dotted-decimal IPv4 addresses in Exhibit
A, Plaintiff also provides the alleged Internet-Service Provider (ISP) for each IP
address. [D.E. 1-1].  The exhibit lists six ISP's: Comcast Cable Communications,
Bright House Networks, MPInet, Bellsouth.net, Verizon Online, and Embarq
Corporation.  *Id*.  It is highly unlikely that a single individual subscribed to six
ISPs, utilizing their collective service to infringe upon Plaintiff's copyright.  And
while the list presented as Exhibit A may contain the type of overlap Plaintiff

theorizes, speculation that less than 31 defendants are represented by 31 IP addresses does not provide adequate grounds to join all 31 Doe Defendants, particularly in light of six ISPs providing service.  Even if this Court were to assume that all IP addresses belonging to an ISP reflect a single defendant, this still would leave at least six defendants who most likely are not required parties to a single action.  Joinder in this case is therefore permissive and Fed. R. Civ. P. 20 controls.

### B. Permissive  Joinder of Parties Under Fed. R. Civ. P. 20

In its Complaint [D.E. 1], Plaintiff claims that joinder is proper because Defendants engaged in a series of transactions, exchanging pieces of a file which contributed to a chain of data distribution that infringed upon Plaintiff's copyright.[9] This argument is identical to those made by the plaintiff in its complaint in *Bubble Gum Productions, LLC v. Does 1-80*, 12-20367-CLV-SEITZ, 2012 WL 2953309 (S.D. Fla. 2012); *Bubble Gum Productions, LLC, Plaintiff, v. Does 1 - 80, Defendants.*, 2012 WL 381691 (S.D.Fla.) (complaint for plaintiff in *Bubble Gum Productions*).  It

---

[9] "Joinder of Defendants is proper because they engaged in a series of transactions to illegally reproduce and distribute the Video amongst each other.  Specifically, the Defendants intentionally entered and participated in a single BitTorrent swarm that was formed for the purpose of exchanging pieces of a file that was unique to the swarm..." [D.E. 1 ¶ 9]

"Joinder is also proper because Defendants participated in a civil conspiracy to illegally reproduce and distribute the video. The Defendants intentionally entered a swarm for the purpose of collaborating with the other Defendants and numerous third parties to conduct illegal distribution and reproduction of the particular Video file. The Defendants were collectively engaged in the conspiracy even if they were not engaged in the swarm contemporaneously because they all took concerted action that contributed to the chain of data distribution..." *Id*. ¶ 10

"Joinder is also proper at the early stage of the litigation because, upon information and belief, a single individual can be associated with multiple IP addresses..." *Id*. ¶ 11

"Further, Defendants share the same questions of law with respect to copyright infringement..." *Id*. ¶ 12

is also similar in many respects to part of the justification for permissive joinder in *Hard Drive Productions, Inc. v. Does 1-188*, 809 F. Supp. 2d 1150 (N.D. Cal. 2011).

In *Bubble Gum Productions,* 12-20367-CLV-SEITZ, 2012 WL 2953309, the court rejected the argument that permissive joinder was justified. "The Doe Defendants' decision to obtain the BitTorrent protocol and download the same video does not in and of itself constitute the same transaction, occurrence, or series of transactions or occurrences." *Bubble Gum Productions, LLC,* 12-20367-CLV-SEITZ, 2012 WL 2953309. "This is because the BitTorrent protocol facilitates the transactions between users, and '[m]uch of the BitTorrent protocol operates invisibly to the user after downloading a file, subsequent uploading takes place automatically if the user fails to close the program.'" *Id.* quoting *In re BitTorrent Adult Film Copyright Infringement Cases*, 2012 WL 1570765, at *11 (E.D.N.Y. May 1, 2012) (Order and Report and Recommendation).

In *Hard Drive Productions* the court analyzed the appropriateness of joining 188 defendants that were alleged to have been members of the same BitTorrent swarm. The court found misjoinder for the following reasons:

> Does 1–188 did not participate in the same transaction or occurrence, or the same series of transactions or occurrences. Under the BitTorrent Protocol, it is not necessary that each of the Does 1–188 participated in or contributed to the downloading of each other's copies of the work at issue—or even participated in or contributed to the downloading by any of the Does 1–188. Any "pieces" of the work copied or uploaded by any individual Doe may have gone to any other Doe or to any of the potentially thousands who participated in a given swarm. The bare fact that a Doe clicked on a command to participate in the BitTorrent Protocol does not mean that they were part of the downloading by unknown

hundreds or thousands of individuals across the country or across the world.

*Hard Drive Productions,* 809 F. Supp. 2d 1150, 1163.

The court in *Hard Drive Productions* cited an exhibit submitted by the plaintiff detailing the defendants' BitTorrent activity similar to Plaintiff's Exhibit A [D.E. 1-1] and noted that the activity of the defendants occurred on "different days and times over a two-week period," leading the court to find that while the defendants may have participated in the same swarm, there was "no evidence to suggest that each of the [defendants] 'acted in concert' with all of the others." *Hard Drive Productions*, 809 F. Supp. 2d 1150, at 1163.; *See Liberty Media Holdings, LLC v. BitTorrent Swarm*, 277 F.R.D. 672, 675 (S.D. Fla. 2011). (discussing the same.) The court also noted that "although Hansmeier state[d] that he 'collected data on the peers in the swarm, including what activities each peer was engaging in and other important [data] such as the date and time that each Defendant was observed by the software as engaging in infringing activity,' the exhibit attached to the complaint reflect[ed] that the activity of the different IP addresses occurred on different days and times over a two-week period." *Hard Drive Productions*, 809 F. Supp. 2d 1150, at 1164.  In the instant case, Peter Hanmeiser, a technician at "6881 Forensics" has made a similar declaration. [D.E. 4-2].

18.  The first step in the infringer-identification process is to locate a **single swarm** where peers are distributing the Video.  I accomplished this step by using a variety of techniques to locate the torrent file sharing the name of [the] copyrighted Video.  Such files are commonly located on torrent indexing sites, but can also be found on Internet file-sharing

forums and areas where users congregate.  Because a torrent file only contains directions about where to find **the swarm** associated with a particular item of digital content, the next step is to locate **that swarm**. ...

20.  After locating **the swarm**, I used 6881's proprietary forensic software to conduct an exhaustive real time "fingerprint" of individuals in **the swarm**. Through this "fingerprint," I can determine:

    a.    The **time and date** the infringer was found;

    b.    The **time(s) and date(s)** when a portion of the copyrighted file was downloaded successfully to the infringer's computer;

    c.    The **time and date** the infringer was last successfully connected to BitTorrent network;

    d.    The Internet protocol ("IP") address assigned to the infringer's computer;

    e.    The BitTorrent software application used by the infringer;

    f.    The size of the copyrighted file;

    g.    The percent of the file downloaded by 6881's software from the infringer's computer;

    h.    The percent of the copyrighted file on the infringer's computer which is available at that moment for copying by other peers; and

    i.    Any relevant transfer errors.

*Id.* ¶¶ 18, 20. (emphasis supplied)

In the instant case, the alleged infringing activity involves only slightly more than one-sixth of the number of defendants in *Hard Drive Productions.  See Hard Drive Productions*, 809 F. Supp. 2d 1150. (188 defendants.)  Despite this, the activity listed in Plaintiff's Exhibit A [D.E. 1-1] occurred over a considerably longer period of time than the activity in *Hard Drive Productions. See Hard Drive Productions*, 809 F. Supp. 2d 1150, at 1164. ("[T]he activity of the different IP addresses occurred on different days and times over a two-week period").  This Court has examined Exhibit A, and with the exception of three days which had two occurrences of activity on each, the activity occurred on different days and times

over a period of more than four months.[10]  This Court is not persuaded that this activity represents a single swarm, or that even if it did, that it satisfies the first prong of Fed. R. Civ. P. 20(a)(2).

Assuming that the Defendants had used BitTorrent simultaneously, however, this still would not imply that Defendants "participated in or contributed to the downloading of each other's copies of the work at issue" because of the decentralized operation of BitTorrent.  *Hard Drive Productions*, 809 F. Supp. 2d 1150, at 1163. "Merely participating in a BitTorrent swarm does not equate to participating in the same transaction, occurrence, or series of transactions or occurrences".  *Liberty Media Holdings, LLC v. BitTorrent Swarm*, 277 F.R.D. 672, at 675 (S.D. Fla. 2011); (internal citation omitted).  *See LaFace Records, LLC v. Does 1–38,* 2008 WL 544992, at *7 (E.D.N.C. Feb. 27, 2008) ("[M]erely committing the same type of violation in the same way does not link defendants together for purposes of joinder.")

Plaintiff has attempted to address this issue by claiming in ¶ 10 of its Complaint [D.E. 1] that the Defendants participated in a civil conspiracy and intentionally entered a swarm for the purpose of collaborating with the other Defendants and numerous third parties to distribute and reproduce the Video, and that even if they were not a member of the swarm, they were still engaged in the conspiracy.  This argument is unpersuasive.  The likelihood that the Defendants

---

[10] The total elapsed time from the first occurrence to the last was 141 days, 4 hours, 10 minutes, and 5 seconds.

actually knew each other and formed a conspiracy is extremely low given how BitTorrent operates.  See *Bubble Gum Productions*, 12-20367-CLV-SEITZ, 2012 WL 2953309; *Hard Drive Productions,* 809 F. Supp. 2d 1150; *Liberty Media Holdings,* 277 F.R.D. 672.  (all discussing how BitTorrent operates).  Plaintiff's allegations regarding the Defendants' alleged intentional acts constituting a conspiracy are conclusory and not convincing.

Apart from downloading the same video through a BitTorrent client utilizing the BitTorrent protocol, this Court finds that the facts as pleaded fail to connect all of the Doe Defendants to each other.  As noted by our sister court, "[U]sers themselves are not choosing to engage in file sharing with other particular users; rather, the BitTorrent protocol is determining which users to connect to in order to obtain the additional pieces of a file. Thus, users are doing nothing more than initiating the file sharing process by obtaining the BitTorrent protocol and selecting a file for downloading." *Bubble Gum Productions,* 12-20367-CLV-SE1TZ, 2012 WL 2953309, at *3.  Users can even leave their computer, go to the grocery store, the mall, or even take a vacation, and so long as the computer remains powered on with an Internet-connection, the file sharing process continues indefinitely among an undefined number of users. *Id.*

Additionally, courts have found that joining defendants in BitTorrent copyright infringement cases creates considerable judicial efficiency-related problems. *Bubble Gum Productions,* 12-20367-CLV-SEITZ, 2012 WL 2953309. Among them is the number and variety of individualized defenses  that can be

raised when numerous Doe defendants are joined in a single case.  *Id.*  Here, 31 potentially separate and unique defenses would create an unmanageable case with respect to motion practice and trial.  *See Id.* ("The assertion of defenses unique to each of 80 Does would create an unmanageable case with respect to motion practice and trial.")

In practice, these separate defenses would create potentially 31 miniature trials, each involving its own evidence and testimony.  *See Hard Drive Productions,* 809 F. Supp. 2d 1150. ("[P]ermitting joinder would force the Court to address the unique defenses that are likely to be advanced by each individual Defendant, creating scores of mini-trials involving different evidence and testimony.") *See also Liberty Media Holdings,* 277 F.R.D. 672.  (quoting and holding the same).

Some might claim to be victim to unapproved use of their home unsecured wireless internet network, and that an unknown (and likely unidentifiable) party engaged in the alleged activity.[11]  Others may claim that their computer was infected with some variety of malware, and that if their computer engaged in the alleged infringing activity, it was not under their control.  Others may simply invoke the "it wasn't me" defense.  Lastly, it may be claimed that their computer contained only unusable bits of data, not viewable or usable in any way unless they obtained more data allowing the file to be assembled into Plaintiff's video.  Procedurally, some Defendants may move for summary judgment.  Others may

---

[11] This argument has already been raised by one defendant in her "Motion To Squash/Vacate" [*sic*] [D.E. 12].

19

move to dismiss.  A few may wish to proceed to trial.[12]

Finally, allowing the permissive joinder of all 31 Doe Defendants would prejudice the Defendants due to the logistical burdens that would arise in the course of litigation.  *Liberty Media Holdings*, 277 F.R.D. 672. citing *Hard Drive Productions,* 809 F. Supp. 2d 1150.  ("[E]ach defendant must serve each other with all pleadings—a significant burden when, as here, many of the defendants will be appearing *pro se* and may not be e-filers.  Each defendant would have the right to be at each other defendant's deposition—creating a thoroughly unmanageable situation. The courtroom proceedings would be unworkable—with each of the [Defendants] having the opportunity to be present and address the court at each case management conference or other event.") In other words, Defendants who would like an opportunity to defend against these allegations face the Hobson's choice of participating in an overly burdensome discovery process or capitulating to the Plaintiff.  *See Bubble Gum Productions,* 12-20367-CLV-SEITZ, 2012 WL 2953309 (finding in a similar case that joinder of a large number of *pro se* Doe Defendants would cause an overly burdensome discovery process).

## IV. CONCLUSION

For the above reasons, this Court finds that the Defendants in this case have not been properly joined, and invokes its discretion to sever Does 2-31, leaving the first Doe as the only defendant in this action.

---

[12] Despite Plaintiff's demand for a jury trial, it appears that the majority of BitTorrent cases are filed without the intent to actually proceed to a jury trial.

While three Does have moved to quash subpoenas served on their Internet Service Providers, this Court does not have the authority to quash a subpoena issued by another court.[13]  Fed. R. Civ. P. 45(c)(3)(A).  This Court will, however, vacate the portion of its Order Granting Plaintiff's Motion For Leave To Take Discovery Prior To The Rule 26(f) Conference that authorizes the issuance of the subpoenas on the ISPs for identifying information for Does 2–31 as these Defendants are no longer parties to this lawsuit. Plaintiff is hereby directed to notify each ISP to whom it has issued a subpoena, that Plaintiff is no longer authorized to seek discovery with respect to Does 2–31 who are no longer parties to this litigation.  Failure to comply may result in sanctions.  *See, e.g., Mick Haig Prods. E.K. v. Stone*, 2012 WL 2849378 (5th Cir. July 12, 2012).

Therefore it is hereby ORDERED AND ADJUDGED that:

1.  Does 2–31 are severed from this action and the claims against them are DISMISSED WITHOUT PREJUDICE.

2.  The Order Granting Plaintiff's Motion For Leave To Take Discovery Prior To The Rule 26(f) Conference [D.E. 6] is VACATED IN PART.  Plaintiff is no longer permitted to conduct discovery to obtain the subscribers' identifying information for

---

[13] This Court has already expressed uncertainty as to why the subpoenas were issued in another judicial district and even more oddly, another state. *See* [D.E. 26] (asking the Plaintiff to explain the curious fact that four of the six subpoenas were hand-delivered to the same registered agent located in Chicago.)  The *Bubble Gum Productions* court also found this to be odd.  "It is unclear why the subpoenas were issued in another judicial district for information about Doe Defendants who allegedly reside in this district." *Bubble Gum Productions,* 12-20367-CLV-SEITZ, 2012 WL 2953309.  In that court, the subpoenas were issued by the U.S. District Court for the District of Columbia.  In the instant case, the subpoenas were issued by the United States District Court for the Northern District of Illinois.  Of note, the Plaintiffs in both cases were represented by the same counsel.

the IP addresses associated with Does 2–31.

3.  No later than August 23, 2012**,** Plaintiff must file a notice identifying which IP address belongs to Doe Defendant One, as Plaintiff's Exhibit A [D.E. 1-1] is unnumbered.

4.  Plaintiff must provide a copy of this order to the ISPs to whom the subpoenas were issued no later than August 23, 2012**,** and file a notice of compliance in this Court by August 23, 2012**.**

DONE AND ORDERED in Chambers at Miami, Florida, this 6th day of August 2012.

_____
UNITED STATES DISTRICT JUDGE

copies provided: counsel of record
Magistrate Judge Torres

22